Timothy KEMPF, Appellant–
Defendant,

v.

ST. PAUL REINSURANCE COMPANY
LIMITED (U.S. Reinsurance Trust),
Appellee–Plaintiff.

No. 82A01–0611–CV–486.

Court of Appeals of Indiana.

Aug. 21, 2007.

B. Michael Macer, Evansville, IN, Attorney for Appellant.

Philip E. Kalamaros, St. Joseph, MI, for Appellee.

**OPINION**

BARTEAU, Senior Judge.

*STATEMENT OF THE CASE*

Appellant/Cross–Claimant Timothy Kempf ("Kempf") appeals the trial court's denial of his motion for summary judgment and the grant of summary judgment in favor of Appellee/Cross–Claim Defendant St. Paul Reinsurance Company Limited (U.S. Reinsurance Trust) ("St.Paul"). We reverse and remand for further proceedings.

*ISSUES*

Kempf raises five issues for our review, which we consolidate and restate as:

I. Whether the trial court erred in determining as a matter of law that the insurance contract between Kempf and St. Paul should be interpreted to limit Kempf's financial interest to what he was owed under an installment sales contract.

II. Whether Kempf failed to materially comply with the requirements of the insurance policy, thus limiting his recovery thereunder.

III. Whether summary judgment is appropriate on Kempf's claim that St. Paul acted in bad faith.

*FACTS AND PROCEDURAL HISTORY*

In April of 1998, Kempf purchased commercial property located in Evansville, Indiana, paying $10,000 down and executing a promissory note in favor of Citizen's

Bank for the balance of the $60,000 sales price. Kempf also purchased the personal property associated with the nightclub that was formerly located on the property.

Later the same year, Kempf entered into a lease agreement with DFW Vending, Inc. ("DFW") for the real estate and equipment. Pursuant to the lease, Kempf obtained and paid the premiums on the property liability coverage provided by St. Paul, with the understanding that DFW would reimburse him for fifty percent of the premiums.

On February 10, 2000, Kempf and DFW entered into an installment sales contract whereby DFW would purchase from Kempf the real estate, furniture, fixtures, and equipment. Under the contract, DFW was required to pay $10,000 up front and to make monthly payments of $1,325. Upon DFW's payment of the $70,000 purchase price, Kempf was to execute a warranty deed conveying the property to DFW. Kempf did not cancel his insurance coverage through St. Paul, as he wanted to make sure that DFW had coverage in place.

The installment contract between Kempf and DFW provided that any insurance proceeds claimed as payment for loss or damage of the property was to be applied to "restoration and repair of the loss or damage, unless such loss or damage cannot be fully restored or repaired with available insurance proceeds or there exists an uncured event of default by DFW under this contract on the date of receipt of such proceeds...." (Appellant's App. at 148). The contract further provided that if either of the aforementioned events occurred, "the proceeds may be applied, at

Kempf's option, toward prepayment of the contract balance, with any excess to be paid to Kempf." *Id.*

DFW paid the up front money and was current in its monthly payments at the time the property was damaged by a fire on October 11, 2001. After the fire, DFW stopped making the payments. Thereafter, the city razed the building and obtained a lien against the property in the amount of $9,130.44.

At the time the fire occurred, Kempf was the named insured on the contract that he had purchased from St. Paul[1], and he claimed the policy limits of $105,000 for the destruction of the real property and $20,000 for the personal property. Although admitting that the damages equaled the policy limits, St. Paul refused to pay those limits to Kempf. Instead, St. Paul treated Kempf as a mortgagee and paid him $40,603.40, the amount owed by DFW to Kempf under the installment contract.

On March 7, 2002, DFW filed a complaint in which it named Kempf, Fifth Third Bank (as mortgagee), and St. Paul as defendants. DFW alleged that the installment contract for purchase of the property required that any insurance proceeds received as payment for any loss or damage to the property be applied to restoration or repair of the property. DFW further alleged that Kempf breached the contract, and it asked the Court to order specific performance. The trial court subsequently granted summary judgment on St. Paul's behalf against DFW, finding DFW had no interest in the insurance policy.[2]

1. At the time the policy was purchased, the holder of the liquor license for the property was also listed as an insured. The license was subsequently transferred to DFW, and the original holder's company was administratively dissolved. Accordingly, at the time of the fire Kempf was the only named insured with a financial interest in the property.

2. The motion for summary judgment is not contained in the record on appeal; however,

Kempf filed a cross-claim against St. Paul, in which he asked for judgment in an amount that would "fairly compensate [him] for his losses, punitive damages, treble damages, attorney fees, and costs...." (Appellant's App. at 32). Kempf followed his cross-claim by filing a motion for partial summary judgment, which the trial court denied. St. Paul filed a motion for summary judgment, which the trial court granted. This appeal followed.

## DISCUSSION AND DECISION

### I.

■ The trial court denied Kempf's summary judgment motion and granted St. Paul's summary judgment motion "pursuant to *Property Owners Insurance Co. v. Hack,* 559 N.E.2d 396 (Ind.Ct.App.1990)." (Appellant's App. at 13). In short, the trial court determined that St. Paul was required to pay Kempf only the amount owed by DFW under the installment contract. Kempf argues on appeal that the facts of *Hack* are materially distinguishable from those of the present case. St. Paul responds that the instant case is factually similar to *Hack* and that Kempf's recovery is limited because he is, in essence, a mortgagee. In support of its response, St. Paul cites cases describing the limits of a mortgagee's right to insurance proceeds.

The purpose of summary judgment is to terminate litigation about which there is no factual dispute and which may be resolved as a matter of law. *Ratcliff v. Barnes,* 750 N.E.2d 433, 436 (Ind.Ct.App.2001), *trans. denied.* When reviewing the grant or denial of summary judgment, this court applies the same standard as the trial court. *Id.* Summary judgment is appropriate only

if the designated evidentiary material shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* Generally, construction of a written contract is a question of law for which summary judgment is particularly appropriate. *Merrillville Conservancy District ex rel. Bd. of Directors v. Atlas Excavating, Inc.,* 764 N.E.2d 718, 724 (Ind.Ct.App.2002).

In the case cited by the trial court, the Hacks owned property that they sold to the Laceys for $300,000 under an installment contract. The installment contract required the Laceys to maintain insurance for the Hacks' benefit; however, the insurance carrier thereafter informed the Hacks that the Laceys had allowed the insurance to lapse. The Hacks subsequently purchased insurance from Property Owners Insurance Company, and in doing so, informed the Property Owners' agent that there were three interested parties: the Irwin Union Bank as the sellers' mortgagee, the Hacks as sellers, and the Laceys as buyers. 559 N.E.2d at 398. The insurance policy, which covered the loss of the property, listed the Laceys as the named insureds, and, under an "additional interest schedule," listed the Hacks as contract holders and Irwin Union Bank as mortgagee under a standard mortgage clause. *Id.* The building was subsequently destroyed by fire; and while Property Owners paid $186,000 to Irwin Union Bank in discharge of the Hack's mortgage, it refused to make any payments to the Hacks. *Id.* The Hacks brought an action to recover proceeds under the policy, arguing that the policy was purchased to protect their interests under the installment contract. *Id.* at 399.

Kempf indicates in his statement of the case that summary judgment was granted on the basis that DFW had no interest in the policy covering the property. In its brief, St. Paul agreed with Kempf's statement of the case.

In determining whether the Hacks were eligible to receive proceeds under the policy, we noted that the policy was ambiguous because it listed the Hacks as additional insureds without defining the extent of the coverage. *Id.* We also noted that the Hacks, as installment contract sellers, had an insurable interest in the property. *Id.* (citing *Meade v. North Country Co-op. Insurance Co.*, 120 A.D.2d 834, 501 N.Y.S.2d 944 (1986)). We further noted, however, that a seller's insurable interest alone does not guarantee entitlement to the proceeds *of a buyer's insurance. Id.* (emphasis applied). We held that under the circumstances of the case, "the Hacks' reasonable expectation was that their interests would be protected, and it was Property Owners' responsibility either to see that those interests were protected or to refuse to write the policy." *Id.* at 402.

In arriving at our holding in *Hack,* we emphasized three general rules: (1) contract sellers are analogous to mortgagees for purposes of insurance proceeds; (2) a mortgagee's interest in insurance proceeds is limited to the extent of the debt secured by the property; and (3) contract sellers are entitled to recover proceeds equal to the amount due on the contract, subject to the policy's limits of liability. *Id.* at 400. These three rules form the basis for St. Paul's argument that, as a matter of law, Kempf is limited in his recovery to the amount owed by DFW under the installment contract.

We agree with Kempf that the *Hack* is not applicable to the instant case. While it is true that a contract seller's position is analogous to that of a mortgagee, and that this similarity may entitle a contract seller to limited proceeds under the contract

buyers' policy, we do not conclude that the analogy limits a contract seller's entitlement to proceeds under a contract in which he is the named insured. Indeed, we note that *Meade,* one of the cases cited in *Hack* for support of the analogy, was followed by *Johnson v. New York Mutual Underwriters Insurance Co.*, 182 A.D.2d 1070, 582 N.Y.S.2d 871 (N.Y.App.Ct.1992), in which the court held that case law involving a mortgagee's rights under fire insurance policies was not applicable as a limit on a contract seller's right to proceeds.[3]

In *National Security Fire and Casualty Co. v. Miller,* 394 So.2d 31 (Ala.App.Ct. 1980), *cert. denied,* 394 So.2d 33, a party purchased fire insurance on his property. The Court of Civil Appeals of Alabama held that although the party had entered into an installment contract as the seller, the insurer's liability to that party for fire loss had to be measured by terms of the policy, not by the terms of the installment contract. Specifically, the court held:

> The insurance company's "duty is to respond to the party with whom they made the contract of insurance." The insurance company's liability in this appeal must be measured by the terms of its contract and not by the terms of an agreement between the insured and a third party....
>
> An insured who enters into an agreement of sale of property covered by a fire policy and between the time of the agreement and the time fixed for settlement, a loss by fire occurs, can recover from the insurer the full amount of the loss, but upon such recovery becomes a trustee for the vendee of the proceeds of the policy

---

**3.** St. Paul cites *Skendzel v. Marshall,* 261 Ind. 226, 301 N.E.2d 641 (1973) in support of its contention that Kempf should be treated as a mortgagee. We cannot conclude that a case

discussing the right of a contract purchaser to avoid forfeiture should be interpreted to limit a contract seller's right to recover proceeds as a named insured.

on the theory that while, until settlement, the vendor remains the legal owner of the property, the entire beneficial interest passes to vendee upon execution of the agreement of sale, and in order to retain any portion of the proceeds as against the vendee, the vendor must establish that he has some valuable interest in the insured property beyond the mere ownership of legal title.

394 So.2d at 32–33 (citations omitted).

In *Mutual Benefit Insurance Co. v. Goschenhoppen Mutual Insurance Co.,* 392 Pa.Super. 363, 572 A.2d 1275, 1277 (1990), the court held that even though a contract seller retains only legal title, he or she may insure the entire property. The court further held that "'insurance upon a house, effected by the vendor, is prima facie insurance upon the whole legal and equitable estate,' and not upon what a seller actually possesses...." *Id.* (citing *Dubin Paper Co. v. Insurance Co. of North America,* 361 Pa. 68, 78, 63 A.2d 85, 90 (1949)). Thus, as between the insured and the insurance company the insured remains the owner of the property until the sale is completed. (*Dubin,* 63 A.2d at 94). The conclusion expressed in *Dubin* was adopted by the Court of Appeals of Tennessee Eastern Section in *King v. Dunlap,* 945 S.W.2d 736 (1996).

■ The upshot of *Miller, Goschenhoppen, Dubin,* and *King* is that between an insured and the insurer, the insured seller is entitled to recover insurance proceeds for the full value of the property for which he paid, and the insurer received, premiums. The subsequent division of these proceeds is a matter between the contract seller and purchaser.

In the present case, the policy provided that in the event of loss or damage, St. Paul would, at its option, (1) pay the value of the lost or damaged property; (2) pay the cost of repairing or replacing the lost or damaged property (subject to limitation); (3) take all or part of the property at an agreed or appraised value; or (4) repair, rebuild, or replace the property with other property of like kind and quality (subject to limitation). (Appellant's App. at 173). St. Paul has exercised none of the required options, and after collecting premiums for $125,000 of coverage, is attempting to limit the coverage to less than a third of that amount. We agree with the reasoning set forth in the aforementioned quartet of cases; accordingly, St. Paul should pay the policy limits to Kempf. Any division of the proceeds is an issue between Kempf and DFW.

II.

■ St. Paul contends that the trial court's grant of summary judgment is proper because Kempf failed to comply with policy conditions. Specifically, St. Paul argues that the policy is void because Kempf concealed his interest in the covered property. St. Paul's argument is premised on the policy provision that renders the commercial property coverage void if the insured intentionally conceals or misrepresents a material fact concerning his interest in the covered property. (Appellant's App. at 345). St. Paul's argument is further premised on its insistence that Kempf is a mortgagee under the installment contract with DFW.

As we stated above, summary judgment is appropriate only if the designated evidentiary material shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. St. Paul fails to show that there is no issue of material fact or question of law pertaining to whether Kempf "intentionally" concealed the fact that he was selling the property by contract or to whether

that fact, if intentionally concealed, is a "material" fact.

■ St. Paul also contends that the trial court's grant of summary judgment is proper because Kempf failed to submit a timely proof of loss form. St. Paul points to the policy provision that requires the insured to "[s]end us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with necessary forms." (Appellant's App. at 340). The policy further provided that the insured would "[c]ooperate with us in the investigation or settlement of the claim." *Id.*

The designated evidence shows that St. Paul sent the first "necessary form" to Kempf on May 15, 2001. Although there are blanks to be filled in by Kempf, the "Amount Claimed" was typed in by St. Paul as $36,603.20. The form was accompanied by a check in the aforementioned amount.

St. Paul sent a second form on May 15, 2001, and this form left the "Amount Claimed" line blank. The form contained an additional line for an "Amount Advanced and not in Dispute" which was typed in by St. Paul as $40,663.42. The form was accompanied by a check in that amount. Kempf filled in the blanks and returned the form; however, he made a change to the wording of the form. The form as typed by St. Paul stated, "In consideration of and to the extent of said payment the undersigned hereby subrogates said [St. Paul]...." (Appellant's App. at 410). In an apparent effort to show that he was not accepting the $40,663.42 as the full amount of the proceeds, Kempf changed the "extent of said payment" provision to read "the extent of the payment in the amount shown in line 6 ["Amount Claimed"] above."

With reference to the first of the "necessary forms," we note that Kempf was claiming the $125,000 insured value of the property, and he understandably refused to sign a form that fixed his claim at far less. With reference to the second form, we note that Kempf's alteration was again designed to prevent St. Paul from limiting the amount of his recovery by, in his perception, correcting the original form's ambiguous language.

Our examination of the designated evidence leads us to the conclusion that St. Paul is not entitled to summary judgment. The initial form sent by St. Paul to Kempf was improper because it mischaracterized the extent of Kempf's claim. The second form was perceived by Kempf as ambiguous, and he did not fail to comply with the policy by attempting to remove that ambiguity.

### III.

■ In his cross-claim against St. Paul, Kempf contended that St. Paul acted in bad faith when it intentionally (1) "misrepresented pertinent facts or insurance policy provisions" relating to coverage; (2) "failed to acknowledge and act reasonably promptly upon communications with respect to claims arising under [the policy]"; (3) "failed to adopt and implement reasonable standards for the prompt investigation of [Kempf's] claims"; (4) "refused to pay [Kempf's] claims without conducting a reasonable investigation based upon all available information"; (5) "failed to affirm or deny [Kempf's] coverage of claims within a reasonable time after proof of loss"; (6) "failed in good faith to effectuate prompt, fair, and equitable settlement of [Kempf's] claim despite the fact liability has become reasonably clear"; and (7) "failed to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy

coverage in order to influence settlements under other portions of the insurance policy coverage." (Appellant's App. at 31–32). In its subsequent motion for summary judgment, St. Paul asserted that Kempf could not recover for bad faith. Interestingly, in his own motion for partial summary judgment, Kempf specifically asserted that he was not asking for summary judgment on the bad faith issue. (Appellant's App. at 108). The trial court granted St. Paul's motion for summary judgment on the specific issue of whether Kempf was entitled to recover the entire proceeds of the policy; thus, it did not appear to rule on the propriety of summary judgment on the bad faith issue.

 Indiana recognizes a cause of action for the tortious breach of an insurer's duty to deal with its insured in good faith. *See Erie Insurance Co. v. Hickman,* 622 N.E.2d 515, 520 (Ind.1993). However, a cause of action does not lie every time a claim is denied, and an insurer may dispute a claim in good faith. *Masonic Temple Assoc. of Crawfordsville v. Indiana Farmers Mutual Insurance Co.,* 779 N.E.2d 21, 26 (Ind.Ct.App.2002); *Hopper v. Carey,* 810 N.E.2d 761, 766 (Ind.Ct.App. 2004). The obligation of good faith and dealing includes the duty to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in payment; (3) deceiving the insured; and (4) exercising an unfair advantage to pressure an insured into settlement of his claim. *Id.* It is the plaintiff's burden to establish bad faith—he must establish with clear and convincing evidence that the insurer had knowledge that there was no legitimate basis for denying liability. *Masonic Temple, id.*

In the present case, the primary thrust of St. Paul's summary judgment motion was the issue of coverage, while the only subject of Kempf's motion was coverage.

Neither party has established that summary judgment is warranted on this issue. Accordingly, the issue should be further explored by the parties on remand.

### CONCLUSION

The trial court erred in determining that *Hack* is applicable to this case. Accordingly, the trial court erred in granting summary judgment on that basis. Furthermore, the grant of summary judgment is not warranted on the final two issues raised by Kempf.

Reversed and remanded for further proceedings.

BAKER, C.J., and CRONE, J., concur.